**William FINK and Betty Fink, Appellants,**

v.

**FOLEY–BELSAW CO., Appellee.**

**No. 91–3771.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1992.

Decided Jan. 5, 1993.

Richard Everett Dorr, Springfield, MO, argued (Richard E. Dorr and John R. Lightner, on the brief), for appellants.

Thomas R. Larson, Kansas City, MO, argued (Thomas R. Larson and M. Joan Cobb, on the brief) for appellee.

Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

HANSEN, Circuit Judge.

Appellants William Fink and his wife, Betty Fink, brought a products liability action against Foley–Belsaw Company (Foley). After a six day trial, the jury returned a verdict in favor of Foley, and the district court [1] denied the Finks' motion for a new trial. The Finks appeal. We affirm.

I.

The product in question is Foley's M–14 sawmill. The M–14 sawmill does not come equipped with a power source, but is designed so that its mandrel shaft (which drives the saw blade) can be connected to a separate power source. Kerry Middleton purchased an M–14 sawmill. He decided to power his sawmill using a farm tractor's power take-off (PTO) connection. Middleton rented Finks' tractor for this purpose. To connect the tractor's PTO shaft to the saw's mandrel shaft, a yoke was welded onto the PTO shaft, the yoke was placed over the mandrel shaft, a hole was then drilled through the yoke and the mandrel shaft, and a bolt was inserted through the hole to connect the PTO shaft to the saw's mandrel shaft. The bolt extended outward two to three inches beyond the yoke.

Middleton hired Fink to operate the M–14 sawmill. While the sawmill was operating, Fink would reach in with a long-handled shovel to clear away the accumulated sawdust and then would adjust the belts. Once when he did so, his pant leg became caught on the unguarded extended bolt on the rotating yoke/shaft, and he lost part of his right leg.

1. The Honorable Russell G. Clark, Senior United States District Judge for the Western District of Missouri.

The Finks proceeded to trial against Foley on one theory: Foley's product was defective and unreasonably dangerous when sold because Foley knew that some power source connection was to be made on the mandrel shaft, but failed to take steps that would adequately assure a safe connection. The jury returned a verdict in favor of Foley. The district court denied Finks' motion for a new trial in a written order.

On appeal, the Finks raise three arguments.[2] First, they contend that the district court erred in giving a jury instruction defining "unreasonably dangerous defective condition" during jury deliberations. Second, the Finks assert that the district court erred in failing to grant their new trial motion because of improper statements and questions by defense counsel. Finally, they argue that the district court erred in denying their motion for new trial because the verdict was against the weight of the evidence.

## II.

The jury began its deliberations at 1:45 p.m. on the sixth day of trial. At approximately 4:00 p.m., the jury sent the court a question, "May we have a dictionary for definitions?" The trial judge delivered a response stating "No." The jury recessed at 5:15 p.m.

■ The jury was called into the courtroom before beginning deliberations the next day. The trial judge was "aware of the strong likelihood that some or all jurors had resorted to the use of dictionaries during the previous evening's recess." *See Fink v. Foley–Belsaw,* No. 88–3589–CV–S–4, at 4, 1991 WL 474796 (W.D.Mo. November 14, 1991) (order denying motion for new trial). The following exchange then occurred:

COURT: Yesterday afternoon you sent me a note, May we have a dictionary for definitions? And I think I gave you a rather unambiguous response, No. Are you having difficulty with the definition of a word or term?

FOREPERSON: Yes.
COURT: What is the word or the term?
FOREPERSON: Defective.
COURT: Defective. Well I'm going to make this statement. It would have been inappropriate for you to have tried to use a dictionary to come up with the legal meaning of defective as that's used in products liability cases. But I'm going to give you a further instruction concerning defective condition and unreasonably dangerous.

*A product is in a "defective condition unreasonably dangerous" to the user when it has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. A product is not defective merely because it is possible to be injured while using it.*

Failure to provide a safety feature in a machine's design, including a guard or protective device can constitute a defective condition.

The emphasized paragraph is the portion of the instructions that the Finks dispute.

■ "The trial court has broad discretion in the form and language used in instructions to the jury." *Bissett v. Burlington N. R.R. Co.,* 969 F.2d 727, 729 (8th Cir.1992) (citation omitted). We review jury instructions to determine "whether, taken as a whole, they are confusing or misleading in presenting the applicable principles of law." *Id.* at 729–30 (citation omitted). Under Missouri law regarding strict liability, a design is defective if it renders the product unreasonably dangerous. *See Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 377 (Mo.1986) (en banc).

The Finks argue that the instruction misstates Missouri law because it defines unreasonable dangerousness with the consumer expectation test from the Restatement (Second) of Torts § 402A comment i (1965). In *Cowens v. Siemens–Elema AB,*

---

**2.** The Finks also moved to strike portions of Foley's brief and appendix. We did not rely on those portions and therefore grant the motion to strike.

837 F.2d 817, 822 (8th Cir.1988), however, this court found that a similar instruction was not erroneous when considering the instructions given as a whole. Although *Nesselrode* criticized this type of definition, this court found that the Supreme Court of Missouri did not expressly reject such a definition. *Cowens*, 837 F.2d at 822; *see also Nesselrode*, 707 S.W.2d at 377 ("[W]e have not yet formally incorporated, in any meaningful way, the *Restatement's* consumer expectation test into the lexicon of our products liability law."). More recently, this court quoted the Restatement's consumer expectation test and stated that "[c]ourts applying Missouri law also have applied what has become known as the 'consumer expectation' test for unreasonable dangerousness." *Linegar v. Armour of Am., Inc.*, 909 F.2d 1150, 1153 (8th Cir. 1990) (citations omitted). With such precedent, we find that the instructions, when taken as a whole, do not misstate Missouri law or constitute reversible error.

■ The Finks next assert that the instruction should not have been given and that the timing of the instruction placed undue emphasis upon it. "Ordinarily, [the question of unreasonable danger] will be a jury question, and 'the concept of unreasonable danger, which is determinative in a design case, is presented to the jury as an ultimate issue without further definition.'" *Linegar*, 909 F.2d at 1153 (quoting *Nesselrode*, 707 S.W.2d at 378). On this basis, the district court properly refused initially to give the paragraph emphasized above as a jury instruction. The court then decided to give the instruction when the question "was not whether the term should be defined but whether the jury should use a dictionary definition of the term or a legal definition." *See Fink*, No. 88–3589–CV–S–4, at 5 (order denying motion for new trial). Upon the jury's confusion and its likely resort to lay dictionaries for a legal term, the instruction and its timing was understandable and within the court's discretion. Furthermore, another earlier instruction specifically directed the jury to "consider each instruction in light of and in harmony with the other instructions" and that "[t]he order in which the instructions are given is

no indication of their relative importance." We find no reversible error.

■ The Finks also argue that under Federal Rule of Civil Procedure 51, the district court should have granted a new trial and that the use of the disputed instruction denied them the opportunity to discuss it in closing arguments. Failure to precisely comply with Rule 51 does not warrant a new trial absent a showing of material prejudice. *Siddiqi v. Leak*, 880 F.2d 904, 911 (7th Cir.1989) (citations omitted). As noted by the district court, although "neither party was given the opportunity to argue this instruction to the jury," both parties' closing arguments focused on whether the product was defective when sold. *See Fink*, No. 88–3589–CV–S–4, at 5 (order denying motion for new trial). Furthermore, the instruction in question was a supplemental defining instruction given in response to a jury request. "The response to a jury request for supplemental instructions is a matter within the sound discretion of the district court." *United States v. Gibbons*, 968 F.2d 639, 646 (8th Cir.1992) (citation omitted). "'When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.'" *Id.* (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946)). We find that giving the instruction in response to a jury request was within the discretion of the district court and did not materially prejudice the Finks.

## III.

■ The second issue the Finks raise involves their assertion that the district court should have granted their new trial motion because of three allegedly improper and prejudicial statements and questions made by defense counsel. Our review of the district court's denial of the new trial motion on this basis is limited to abuse of discretion. *McBryde v. Carey Lumber Co.*, 819 F.2d 185, 188 (8th Cir.1987).

■ First, the Finks argue that the defendant's questioning of the Finks' doctor regarding their medical bills and whether

the bills had been paid was prejudicial. Foley correctly asserts that the questions did not include nor raise an inference concerning whether the payment was from a collateral source. Foley also argues that the questions were appropriate for the limited purpose of testing the foundation for admission of the bills. The bills were relevant to the issue of damages because Foley would be potentially liable only for those medical expenses reasonably and necessarily incurred. *Schaeffer v. Craden*, 800 S.W.2d 165, 166 (Mo.Ct.App.1990) (citations omitted). Payment is some evidence of both necessity and reasonableness. While the questions went beyond what was necessary to lay the foundation, there was no resulting prejudice to plaintiffs because the jury never reached the issue of damages. *See Collins v. West Plains Memorial Hosp.*, 735 S.W.2d 404, 409 (Mo.Ct.App. 1987). We find that the court did not abuse its discretion in denying the motion for new trial on this basis.

Second, the Finks contend that their motion for new trial should have been granted because the defendant asked the plaintiffs' expert witness whether he was the "first expert that the plaintiffs contacted to try to convince." The Finks timely objected, and their objection was sustained. Finally, the Finks argue that their motion for new trial should have been granted because of defendant's counsel's references to the economic impact of lawsuits on the company during opening arguments. Again the Finks timely objected, and again their objection was sustained. The Finks did not move for a mistrial on either occasion. We find that the court did not abuse its discretion in denying the motion for new trial on these grounds.

## IV.

The final issue is whether the verdict is against the weight of the evidence. "When reviewing a jury verdict to decide whether it is against the weight of the evidence, the district court conducts its own review of the evidence to determine whether a miscarriage of justice has occurred." *Bissett*, 969 F.2d at 730 (citation omitted). "The

denial of a motion for new trial on this basis is 'virtually unassailable on appeal,' and perhaps should not be reviewable at all by an appellate court." *Id.* (citations omitted). Given the standard of review, assuming such review is permissible, we find that no miscarriage of justice occurred. We affirm the district court's denial of the new trial motion.

Accordingly, the judgment of the district court is affirmed.